Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.

250 Park Avenue, 7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9478

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
MATTHEW B. BURGOS, ADALBERTO
AGUILAR, REUVEN FOGEL, and GABRIEL     Index No: 16-cv-8512 (JPO)
WALKER, Individually and on Behalf of
all Similarly Situated Employees,

                         **SECOND AMENDED CLASS**
                         **AND COLLECTIVE ACTION**
           Plaintiffs,          **COMPLAINT AND JURY**
        vs.                     **DEMAND**

UBER TECHNOLOGIES, INC., and
PORTIER, LLC,

                Defendants.
--------------------------------------------------------x

      Plaintiffs Matthew B. Burgos, Adalbert Aguilar, Reuven Fogel, and Gabriel Walker on

behalf of themselves and all other similarly situated bicycle couriers in New York City who

have worked, or are currently working, for defendants Uber Technologies, Inc. and Portier,

LLC (the "Couriers")(UBER and PORTIER are collectively referred to herein as "UBER"),

allege the following:

## INTRODUCTION

     1.     This is a suit brought on behalf of plaintiffs and a putative class of all current and

former bicycle couriers employed by UBER in New York City (the "Putative Class or

"Couriers"), asking for proper reimbursement to plaintiffs and the Putative Class of: (i) all

gratuities that were earned but stolen, (ii) all legal "Tools-of-the-Trade" expenses, (iii) minimum

and overtime wages under 35 U.S.C. §§ 201 et seq., the Fair Labor Standards Act ("FLSA") and the New York Labor Law Article 6 §§ 190 et seq. and Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations, 12 N.Y.C.R.R. Part 142 ("NYLL"); (iv) all damages under the notice provisions of the NYLL 195, (v) Spread-of-Hours pay, (vi) failure to pay promised incentive pay, and (vii) all damages under federal and state anti-Kickback violations pursuant to 29 C.F.R. § 531.35 and NYLL § 193.  A claim of retaliation pursuant to 29 U.S.C. § 215(b) is filed on behalf of plaintiff WALKER only.

2.      With an estimated market capitalization in-excess of 50 billion dollars, UBER has rapidly grown into one of the wealthiest and largest companies in America.  In or about April 2014, UBER launched UBERrush ("RUSH") in New York City (and San Francisco and Chicago), and on or about March 16, 2016 UBER launched UBEReats ("EATS").  Unlike the other UBER services, RUSH and EATS utilizes only bicycle Couriers to deliver packages.

3.      Almost immediately after the launch of RUSH, it became apparent the overwhelming majority of "packages" being delivered were food orders originating from GrubHub, Inc.  ("GrubHub"), which at all times relevant to this Second Amended Complaint, includes all GrubHub.com and Seamless.com orders.  Substantially all, if not all, GrubHub deliveries are done on-line through the GrubHub website or through a smartphone "app".  Substantially all, if not all, GrubHub orders include a gratuity, and delivery charge – all of which belong to the Couriers, and almost none of which were passed onto the Couriers.

4.      To be specific, on March 16, 2016, UBER did pass on a small part of the gratuities received for the period June 2015 to June 2016 from only three of the hundreds of restaurants serviced by UBER, namely, Big Daddy's, Blockhead's and Genuine Superette.  UBER retained the majority of the gratuities (including Delivery Fees) from these three

restaurants, and, upon information and belief, all of the gratuities received from the hundreds of other restaurants which employed UBER. (By "retained" plaintiffs mean UBER received some of the gratuities and failed to remit them to the Couriers, and UBER failed to collect other gratuities rightfully belonging to plaintiffs and the Putative Class.)

5.     In April 2015, UBER created EATS in an attempt to replace GrubHub, and deal directly with the restaurants on deliveries. While at all times relevant, RUSH allowed gratuities and Delivery Fees (both of which are gratuities) via GrubHub, EATS, at all times, charges users only a purported "Service Charge" of $3.99 (which was later reduced to $2.99 and called a "Booking Fee"). The purported "Service Charges" and "Booking Fees" are also gratuities, and belong to the Couriers.

6.     UBER exploits its Couriers to bolster its bottom-line and continue its rapid expansion to what now amounts to a presence in 482 global cities. UBER even refused to pay promised incentives. When Couriers asked why they were not given their daily incentive pay, UBER makes the Couriers prove the incentive pay for that day. This is impossible unless the Courier takes screenshots of the incentive.

7.     UBER also evaded New York City safety laws. New York City law requires employers provide bicycle delivery couriers with safety gear including helmets, reflective clothing, and lights. By illegally classifying the Couriers as independent contractors, UBER put the decision and burden of purchasing safety equipment on young-adults, most between the ages of 19 and 24.

8.     Couriers are at a great risk of injury. New York City Bureau of Statistics reports that between 1996 and 2005 there were 225 bicyclist deaths. Over seventy seven percent of those deaths were delivery workers; that's over 17 bicycle delivery workers killed every year.

97% of the delivery workers who were killed were not wearing helmets. To put this in perspective, that is three times more than the New York City Police Department and Fire Department fatalities, over the same period.

9.     By misclassifying the Couriers as independent contractors, UBER also evaded paying minimum or overtime wages, or providing worker's compensation or unemployment insurance.

10.     UBER also, inter alia, failed to maintain adequate and accurate written records of the actual hours worked and the true wages earned by employees, and post worker's rights poster in violation of NYLL § 195(4); 12 N.Y.C.R.R. §§ 142-2.6, 146-2.1.

## PARTIES

11.     Plaintiff Mathew B. Burgos ("BURGOS") is an individual and resident of the Bronx.

12.     Plaintiff Adalberto Aguilar ("AGUILAR") is an individual, and resident of the Bronx.

13.     Plaintiff Reuven Fogel ("FOGEL") is an individual, and resident of the Bronx.

14.     Plaintiff Gabrielle WALKER ("WALKER") is an individual, and resident of Brooklyn.

15.     Upon information and belief, defendant Uber Technologies, Inc. is a Delaware corporation headquartered in San Francisco, California. Uber Technologies, Inc. is authorized to conduct business and does conduct business throughout New York, including in New York City.

16.     Upon information and belief, Portier, Inc. ("PORTIER") is a wholly owned subsidiary of UBER. All decisions and functions at Portier are made by UBER such that it has no independent function and exists as a corporation in name only.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to the FLSA, 29 U.S.C.

§216(b), 28 U.S.C. § 1331, and 1337 (federal question) and 28 U.S.C. § 2201 (declaratory

judgment).

18.     This Court has supplemental jurisdiction over the New York State law claims

pursuant to 28 U.S.C. § 1367, as they are so related to the claims over which this Court has

original jurisdiction that they form part of the same case or controversy under Article III of the

United States Constitution.

19.     At all times relevant to this Second Amended Complaint, plaintiffs, the Putative

Class, and defendants were engaged in commerce and/or the production of goods for commerce

within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

20.     Defendants earned in excess of $500,000 per year in each year covered by this

Complaint.

21.     The statute of limitation under the FLSA for willful violations is three years

pursuant to 29 U.S.C. § 255(a) and should be applied here.

22.     Under the FLSA, employees must raise claims for unpaid overtime within two

years of a non-willful violation, or within three years of a willful violation pursuant to See 29

U.S.C. § 255(a).  All plaintiffs and Putative Class members have done so here.

23.     Under NYLL, employees have six years to raise claims for unpaid overtime

wages pursuant to N.Y. Lab. Law § 663(1), (3).

24.     Plaintiffs have consented in writing to be a party to this action, pursuant to

29 U.S.C. § 216(b).

25.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §

1391(a) as the residence of both plaintiffs and defendants, and the forum which a significant

number of the operable facts took place.

## COLLECTIVE ALLEGATIONS

26.     Plaintiffs bring FLSA claims on behalf of themselves and all "bicycle messengers

employed by UBER in New York City from October 31, 2013 through January 1, 2017 who are

not contracted with UBER through a separate business entity, and who elect to opt-in to this

collective action" (the "FLSA Collective").

27.     Defendants are liable under the FLSA for, inter alia, failing to properly

compensate minimum an overtime wages to plaintiffs and the FLSA Collective, and as such,

notice should be sent to the FLSA Collective.

28.     All plaintiffs and Putative Class members are employees, and have done work for

which they were not compensated either at the statutory minimum or overtime rates of pay.

29.     At one point, from April to September 2014, defendants paid the Couriers a flat

$25.00 per hour for all hours worked form 9:00 am to 6:00 pm, after which it fell to $15.00

dollars per hours, and $15.00 per hour on Saturdays and Sundays.  After September 2014, the

rate was reduced to $15.00 per hour (if the deliveries did not equal that amount), and then further

reduced to 80% of the delivery charges plus a bonus of 33% if the Courier made 85% of his/her

deliveries.  This was later changed to a 40% bonus for food-deliveries, with no 85% requirement.

30.     To get the flat rate or the flat rate minimum, the Courier was forced to agree to a

set schedule.

31.     Initially, the Couriers, like WALKER, made over minimum wage, and in-return,

worked up to 60 hours per week.  No over-time wages were ever paid to plaintiffs or the Putative

Class.

32.     As the rates of compensation were reduced, the Couriers began making less than minimum wage.  Deliveries became scarce due to over-hiring, and Couriers were lucky to make $80 for an eleven-hour shift.

33.     Also, UBER failed to pay for the Couriers "Tools-of-the-Trade" expenses, like helmets, replacement bicycles, flat-tire expenses, and repairs from accidents; bringing the Couriers rate of compensation below minimum wage in certain weeks.

34.     There are hundreds of similarly situated current and former employees of defendants employed by UBER from October 23, 2014 through February 1, 2017 who have been underpaid in violation of the FLSA, all of whom would benefit from the issuance of a Court-supervised notice of the present lawsuit and the opportunity to join in the present lawsuit.  Those similarly situated employees are known to defendants, are readily identifiable, and can be located through defendants' records.

## CLASS ALLGATIONS

35.     Plaintiffs also bring New York Labor Law claims on behalf of themselves and a class of persons under Rule 23 of the Federal Rules of Civil Procedure.  The class consists of "all bicycle messengers employed by UBER in New York City from April 1, 2014 through January 1, 2017 who were not employed by UBER through a separate business entity, and who elect to opt-into the class" (the "Rule 23 Class").

36.     All plaintiffs and Putative Class members are employees, and have done work for which they were not compensated either at the statutory minimum or overtime rates of pay.

37.     The persons in the Rule 23 Class identified above number in the hundreds, so joinder of all members is impracticable.  Plaintiffs believe the number of Couriers number in the

hundreds based on the number of Couriers plaintiffs have observed at orientations, while

working on the street, at "hot spots", in the UBER office, and over the internet.  The exact

number, however, is solely in control of the defendants.

38.     Plaintiffs will fairly and adequately protect the interests of the Rule 23 Class.

39.     Defendants have acted or have refused to act on grounds generally applicable to

the plaintiffs and the Rule 23 Class, thereby making appropriate final injunctive relief or

corresponding declaratory relief with respect to the Rule 23 Class.

40.     There are questions of law and fact common to the plaintiffs and the Rule 23

Class that predominate over any questions solely affecting individual members of the Rule 23

Class, including but not limited to:

a) whether the class members are properly classified as employees or
   independent contractors;
b) whether defendants are a unified employer;
c) whether UBER failed to keep true and accurate time records for all hours
   worked by plaintiffs and the Rule 23 Class;
d) what proof of hours worked is sufficient where UBER failed in its duty to
   maintain true and accurate time records;
e) whether UBER failed and/or refused to pay plaintiffs and the Rule 23
   Class minimum, overtime, and spread-of-hours wages as defined by the
   New York Labor Law Article 6 §§ 190 et seq. and Article 19, §§ 650 et
   seq., and the supporting New York State Department of Labor
   Regulations, 12 N.Y.C.R.R. Part 142;
f) whether UBER illegally retained gratuities which rightfully belong to
   plaintiffs and the Rule 23 Class in violation of NYLL § 196-d;
g) whether UBER failed to obtain gratuities which rightfully belong to
   plaintiffs and the Rule 23 Class in violation of NYLL § 196-d, and
   whether UBER had an obligation to collect and pass the gratuities,
   including service charges and delivery fees, onto plaintiffs and the Rule 23
   Class under NYLL § 196-d;
h) whether UBER illegally retained gratuities which rightfully belong to
   plaintiffs and the Rule 23 Class in violation of the Courier's agreement;
i) whether UBER failed to obtain gratuities which rightfully belong to
   plaintiffs and the Rule 23 Class in violation of the Courier's agreement,
   and whether UBER had an obligation to collect and pass onto plaintiffs
   and the Rule 23 Class pursuant to the agreement;
j) whether UBER failed to keep accurate records of gratuities received by

the plaintiffs and the Rule 23 class;

k)  whether UBER failed to post worker's rights posters as required by law;

l)  whether UBER failed to pay incentive pay to plaintiffs and the Rule 23 Class;

m)  whether UBER illegally retained gratuities improperly classified as "Service Fees" which rightfully belong to plaintiffs and the Rule 23 Class;

n)  whether UBER must reimburse plaintiffs and the Rule 23 for all "Tools-of-the-Trade" expenses; and,

o)  the nature and extent of plaintiffs and the Rule 23 Class-wide injury and the appropriate measure of damages for the class.

41.     The claims of the plaintiffs are typical of the claims of the Rule 23 Class they seek to represent.  Plaintiffs and the Rule 23 Class work or have worked for defendants and have not been paid: (i) their minimum and overtime wages for all hours worked or Spread-of-Hours Pay; (ii) their gratuities from RUSH deliveries; (iii) their gratuities from EATS deliveries surreptitiously called "Service Fees"; and (iv) reimbursement of their Tools-of-the-Trade expenses.  Each of the plaintiffs has also been misclassified as an independent contractor.

42.     Defendants have acted and refused to act on grounds generally applicable to plaintiffs and the Rule 23 Class, thereby making declaratory relief with respect to the Rule 23 Class appropriate.

43.     Plaintiffs will fairly and adequately represent and protect the interests of the Rule 23 Class.

44.     Plaintiffs have retained counsel competent and experienced in complex class actions and in employment litigation.

45.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation - particularly in the context of a wage and hour litigation like the present action, where a great number of the individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant.

46.     The members of the Rule 23 Class have been damaged and are entitled to

recovery as a result of defendants' common and uniform policies, practices, and procedures.

47.     Although the relative damages suffered by individual Rule 23 Class Members are not de minimis, such damages are small compared to the expense and burden of individual prosecution of this litigation.

48.     In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about defendants' practices.

## FACTS AS TO PLAINTIFF BURGOS

49.     In or around October 8, 2015, plaintiff BURGOS applied to RUSH, and provided all personal information allowing UBER to conduct a background check.

50.     BURGOS continues to work for UBER as of the date of this Second Amended Complaint.

51.     UBER includes a picture of BURGOS, and his name, on the website for any customer wishing to access BURGOS information.

52.     On December 10, 2015, BURGOS went to an orientation held at the UBER office, located on 633 W. 27th Street, New York.  The orientation was under an hour, and 20-30 Couriers attended.

53.     No safety training occurred at the December 10, 2015 orientation.

54.     At the orientation, BURGOS and the other Couriers were given messenger bags, and iPhones.

55.     BURGOS started work a week after orientation because he had to purchase a bike.  BURGOS was forced to spend $700 on a new bike in April 2016, and has paid for numerous flat tires.

56.     In many weeks, BURGOS worked without being the paid statutory minimum

wage.

57.     BURGOS received wage statements which did not list any of the statutorily

required data including hours worked. See **Exhibit A**.

58.     When BURGOS started working for UBER in or about December 2015, there

were receipts on most of the food deliveries.

59.     Not long after BURGOS started, UBER demanded the restaurants remove the

receipts from the deliveries.

60.     BURGOS asked numerous restaurants why there was no receipt on the food

orders, and was told by the restaurants that UBER specifically directed the restaurant to remove

the receipt.

61.     BURGOS took pictures of many of the receipts that were left on the bags, and

retained many of the actual receipts.  All of the receipts received gratuities, some as high as $18,

all of which were stolen by UBER. See **Exhibit B**.

62.     Most of BURGOS' GrubHub deliveries also had delivery fees, some as high as

$10.00 with gratuities, none of the Delivery Fees were passed onto BURGOS. See **Exhibit C**.

63.     As per the receipts, BURGOS received gratuities on all RUSH food deliveries.

64.     UBER did not pay BURGOS any gratuities, except for a small percentage of the

gratuities from three restaurants -- Blockhead's, Big Daddy's, and Genuine Superette (the "Three

Restaurants"), but only for the period of December 2015 to June 2016.

65.     Prior to paying BURGOS the small percentage of gratuities from the Three

Restaurants, UBER sent BURGOS a text message asking him to confirm the number offered was

equal to the gratuities received from the three restaurants.

66.     BURGOS, however, had no way of knowing if the number proffered by UBER

was correct, because the three restaurants never included receipts on their bags.  BURGOS, however, easily calculated that the number offered by UBER was low considering the number of deliveries he made for the three restaurants during that period.

67.     Upon information and belief, the Three Restaurants also had gratuities misclassified as "Delivery Charges", none of which were passed onto BURGOS.

68.     From July 2016 to present, BURGOS received monthly gratuities from the three restaurants, which are only three of approximately two hundred restaurants which BURGOS has serviced for UBER.  BURGOS has no way of knowing if the monthly payments are correct.

69.     Until the launch of EATS, approximately 70% of all RUSH deliveries were food deliveries originating from GrubHub.

70.     After EATS was launched, the RUSH food deliveries slowly decreased.

71.     As of the date of this Second Amended Complaint, approximately 30% of BURGOS' RUSH deliveries are from food assignments.  However, as of this Second Amended Complaint, the clear majority of deliveries are from EATS.

72.     EATS charged a $3.99 "Service Charge" which was later changed to its current $2.99 "Booking Fee".



73.     At no time has BURGOS received any of the EATS "Service Charges", or

"Booking Fees".

74.     BURGOS also did not receive the incentive pay from many of the days he delivered for UBER, and was forced to prove what the incentive pay was for that day.

75.     BURGOS does not wear safety equipment, and has observed many other Couriers do not wear safety equipment.

76.     BURGOS was paid per trip, calculated as $3.00 base, and $2.00 per mile for each delivery plus a bonus on food deliveries of 33% if BURGOS completed 85% of his assignments. (In late 2016, the incentive bonus was later changed to 40% without the 85% assignment completion requirement.)

77.     On some days, BURGOS, waited hours for a single delivery.

78.     This was due to the over-hiring of Couriers.

79.     BURGOS, and the other Couriers were, and are, forced to wait at "hot spots" to have any chance of getting a delivery.  Hot spots are areas by busy restaurants.

80.     For example, Gotham Market, located at 600 11th Ave., contains numerous restaurants that use both RUSH and EATS.  BURGOS often waits, with other UBER Couriers, outside in a que by Gotham Market.  If BURGOS is not around Gotham Market, there is very little chance of getting an order from the Gotham Market restaurants.

81.     What the restaurants have done is forced their delivery staff outside, and deprived them of safety gear, worker's compensation, unemployment insurance, and a place to wait on cold and rainy days.

82.     BURGOS asked the Manager at Pita Grill, Indikitch, and Vitamin Chick what they were doing with the gratuities to UBER drivers, and was told by each restaurant manager that the tips were for the restaurant.

83.     UBER did not reimburse BURGOS for any Tools-of-the-Trade expenses which includes a new bicycle, numerous repairs, and a significant number of flat tires, all of which BURGOS paid for.

## FACTS SPECIFIC TO PLAINTIFF AGUILAR

84.     AGUILAR is a 24-year-old young adult currently working in another field.

85.     On or around March 12, 2015, AGUILAR applied to RUSH, and provided all personal information allowing UBER to conduct a background check.

86.     On or about March 14, 2016, AGUILAR attended an orientation at 633 W. 27th Street, New York.

87.     There was no safety training at the orientation, and AGUILAR was given a bag and an extra battery pack for his phone.

88.     AGUILAR was expressly told at orientation that if he, or any other Courier, delivered anything for another platform, it would mean immediate termination (deactivation) at UBER.

89.     For approximately six months, starting on March 16, 2016, AGUILAR worked four days a week as a bicycle courier for UBER, delivering for both RUSH and EATS.

90.     AGUILAR did wear a helmet which he purchased for approximately $60. AGUILAR did not wear reflective clothing or a flashing light.

91.     Soon after AGUILAR started, his bicycle was stolen while on a delivery for UBER.  AGUILAR paid approximately $200 to replace the bicycle.

92.     On one delivery for UBER, AGUILAR was injured when his bicycle crashed into a car door that was flung open.

93.     AGUILAR was forced to purchase a new bicycle rim for $80.

94.     AGUILAR also incurred expenses for changing the brakes on his bicycle, and numerous flat tires.

95.     UBER did not reimburse AGUILAR for any Tools-of-the-Trade expenses.

96.     UBER did not pay AGUIALAR any gratuities, including deliveries he made for Blockhead's, Big Daddy's, and Genuine Superette, even though he made numerous deliveries for those three restaurants.

97.     AGUILAR frequently received gratuities, some as high as $18, all of which were stolen.

98.     AGUILAR did not receive any of the purported Service Charges from EATS.

99.     There were no receipts on approximately the 95% of deliveries AGUILAR made.

100.    Customers frequently notified AGUILAR that they had given him a gratuity on-line.

101.    In many weeks AGUILAR would be paid well below the prevailing minimum wage.  At times, AGUILAR would not receive any deliveries for hours.

102.    Due to the over-hiring of Couriers, AGUILAR, and other Couriers, were forced to wait at "hot-spots".

103.    AGUILAR was paid per trip, $3:00 base, and $2:00 per mile for each trip.

104.    AGUILAR was offered a restaurant bonus on food deliveries of 33% if he completed 85% of his food deliveries for the day.

### FACTS SPECIFIC TO PLAINTIFF FOGEL

105.    FOGEL started for UBER in or around March 10, 2016.

106.    FOGEL went to orientation on March 7, 2016, held at the UBER office located at 633 W. 27th Street, New York.

107.    FOGEL received no safety training.

108.    He did receive a bag and extra phone battery at orientation.

109.    In March 2016, 65% of FOGEL's assignments were RUSH deliveries, 35% EATS.

110.    The vast majority of the deliveries made by FOGEL on RUSH were food deliveries, and included gratuities.

111.    Customers told FOGEL they left tips for him on-line.

112.    FOGEL's bike was stolen while on a RUSH delivery, and it cost $525 to replace.

113.    He also bought a helmet for $35, replaced brake pads and cables for $30, and new tubes for $10 apiece for over a dozen flat tires.

114.    At no time was FOGEL reimbursed for any Tools-of-the-Trade Expenses.

115.    FOGEL delivered 5 days a week, eight to nine hours a day for UBER..

116.    FOGEL was paid per trip, $3:00 base, and $2:00 per mile.

117.    FOGEL was offered a restaurant bonus on food deliveries of 33% if he completed 85% of his assignments for the day.  FOGEL often didn't qualify for food the this bonus.

118.    Three to four days a week, FOGEL offered "bonuses" based on how many trips he made in a specific period of time.

119.    FOGEL earned the bonus 1-2 days a week.

120.    At all times, 85% of FOGEL's food deliveries had no receipts.

121.    FOGEL worked in excess of 40 hours per week in many weeks of his employment.

122.    Frequently FOGEL would be paid well below the prevailing minimum and overtime wage.

## FACTS SPECIFIC TO PLAINTIFF WALKER

123.    WALKER started working for UBER as a bicycle Courier in or about September 2014.

124.    WALKER was deactivated on or about December 15, 2016 after he complained about the FLSA and NYLL minimum wage violations.

125.    WALKER attended "On-boarding" in Long Island City, Queens, where he was given a messenger bag with UBER prominently written on it, an iPhone with a charger.

126.    WALKER was told by UBER that if he worked for any other courier service, while logged into the UBER app, he would be immediately deactivated.

127.    When WALKER started his employment, he was paid $15.00 an hour for all hours worked provided WALKER work a specific schedule of hours.

128.    If WALKER did not agree to work a specific schedule of hours, he, like the other Couriers would be paid per delivery.

129.    WALKER worked in excess of 40 hours every week from September 2014 to in or about June 2015.  WALKER was never paid overtime wages.

130.    UBER kept reducing the hourly rate until it reached $7.15 base pay plus mileage.

131.    UBER then changed WALKER, and the other Couriers, to per-delivery only.

132.    In 2016, WALKER began making $80.00 for an eleven-hour shift.

133.    WALKER earned gratuities on every food delivery. See **Exhibit D**.

134.    WALKER also earned gratuities and Service Fees on GrubHub orders. See **Exhibit E**.

135.    WALKER, however, never received any gratuities.

136.    WALKER was forced to replace his brakes several times for a cost of $60, and

incurred a significant number of flats which cost over $160 in total.

137.    WALKER ran into motorcycle while on a RUSH delivery.  He also had accidents with several doors open, and once ran into another bike.

138.    WALKER was never paid for any Tools-of-the-Trade expenses

139.    On or about December 7, 2016, WALKER worked the day but received no compensation.  In fact, UBER informed WALKER that he owed UBER $145.06.

140.    WALKER went to the company office and complained.  At the UBER office WALKER was told the money he owed UBER was for "destination discrimination".

141.    UBER changed the app so the Couriers could no longer see how long the trip is.

142.    After WALKER went to the UBER office to complain, UBER deactivated his account

143.    At no time relevant to this action has WALKER worn a helmet, safety gear, or light.

## UBER'S GENERAL EMPLOYMENT PRACTICES

144.    UBER is a privately held company that operates numerous services, including its ubiquitous livery service.  UBER created an "app", which allows consumers with smartphones to submit a trip request, which the software program then automatically sends to the nearest UBER driver.

145.    As of August 2016, UBER operated in 66 countries and 507 cities worldwide, with a valuation of over 50 billion dollars.

146.    At all times relevant to this Second Amended Complaint, UBER illegally charged its Couriers a 20% kick-back on each assignment.

147.    At no time has UBER paid the Couriers over-time or minimum wages.  UBER

also deprived the Couriers of all gratuities earned as a matter of corporate policy.

148.     UBER failed to pay the Couriers Spread-of-Hours pay.

149.     UBER failed to issue proper wage statements to the Couriers or post the mandatory posters under the NYLL.

150.     At no time has UBER paid the Couriers their Tools-of-the-Trade expenses.

151.     Until late 2016, the UBER app. allowed the Couriers to see how far the assignment required the Courier to ride.  This allowed the Courier to determine if the food assignment (which are substantially all of the Courier's assignments) was acceptable before the Courier accepted the assignment.  The cancelled assignments, of course, went towards the mandatory 85% acceptance rate.

152.     For example: an assignment that required the Courier to ride from 14th Street in Manhattan to 54th Street in Manhattan would pay the Courier $5.60 ($7.00 minus the 20% kick-back to UBER).  It would also take the Courier more than hour to drop off the food assignment, and get back to a spot where the Courier could get another assignment.   Until late 2016, the Courier could cancel the assignment, and wait (sometimes hours) for another.

153.     Sometime in November or December 2016, UBER changed the app. so the Courier could no longer see how far the assignment required them to ride.  The Courier now has to accept the assignment before the Courier see the destination address.  Now, the Courier must accept the assignment, and then immediately cancel it if the Courier felt it were too far, or had some other reason not to complete it.  UBER also initiated a practice of charging the Courier a monetary penalty if he/she canceled an assignment.  UBER calls the newly invented penalty "Destination Discrimination."

154.     As a direct result, the Couriers started working not only well below the statutory

minimum or overtime wages, but occasionally for free; forced to pay UBER back for its arbitrary fines.

155.     At no time did UBER provide its Couriers with a notification they would paid pursuant to the statutory "tip-credit" for tipped employees.  Quite the opposite, UBER withheld all gratuities.

156.     In 2016, UBER began withholding the Couriers' daily incentive pay.  When questioned, UBER forced the Couriers to prove what the daily incentive was, and if the Courier can't, they do not get it.

## FACTS SPECIFIC TO RUSH

157.     In April 2014, UBER launched RUSH, its on-line food and package courier delivery service in three cities, Manhattan, San Francisco, and Chicago.

158.     RUSH is a service whereby merchants can request one of UBER's Couriers through an "on-line" website or through the RUSH "app".  The Courier is then sent his/her assignment and rides to the location and delivers the package.

159.     UBER charges merchants a $3.00 base fare plus $4.00 per mile ($7.00 minimum per delivery).  Couriers will pick up and deliver anywhere within Manhattan. Couriers will deliver between Manhattan and Brooklyn or Queens for a flat rate of $25.

160.     Most RUSH food-deliveries entail a Delivery Fee, which is also gratuity.  For example, most of the GrubHub deliveries require a Delivery Fee, but at no time is the user told the Delivery Fee is not a gratuity.  Nor do the GrubHub receipts state the Delivery Fee is not a gratuity.  In 2016, almost no RUSH deliveries even had receipts.

161.     When UBER launched RUSH in New York, UBER paid its Couriers a flat $25.00 per hour for all hours worked form 9:00 am to 6:00 pm, after which it fell to $15.00

dollars per hours, and $15.00 per hour on Saturdays and Sundays.

162.    The Courier had to agree to work a specific work schedule to qualify for the flat rate, and often required the Couriers to work to work in excess of 40 hours per week.

163.    The flat-rate of pay was reduced to a guaranteed $15.00 per hour for all hours if the Couriers deliveries for the day were less than $15.00 per hour.

164.    The Courier had to agree to work a specific work schedule to qualify for the $15.00 per hour which often required the Couriers to work to work in excess of 40 hours per week.

165.     In or about April 2016, this rate of pay was reduced to a pure pay per delivery compensation, with a bonus of 33% for food deliveries, provided the Courier made 85% of the deliveries for the day.  The rate each Courier receives for an assignment is 80% of a $3.00 base plus $2.00 per mile.

166.    At all times relevant to this Complaint, UBER illegally took back 20% of the Courier's compensation.

167.    Upon information and belief, UBER recognized approximately 70% of all RUSH deliveries were from restaurants, and originated from GrubHub, Inc. ("GrubHub") orders. GrubHub is an internet food-delivery company that was created in 2013 when GrubHub Inc. and Seamless North America LLC merged creating the nation's leading online and mobile food ordering company.  The company's online and mobile ordering platforms allow users to order directly from more than 45,000 restaurants in over 1,100 U.S. cities and London.

168.    In 2016, UBER directed the restaurants using its RUSH and EATS services to remove the receipts from its bags.  Most likely, this was due to complaints from the Couriers.

169.    Plaintiff BURGOS confirmed this from many restaurants.

170.     Generally, all Couriers deliver for RUSH and EATS simultaneously.  In fact, the Courier doesn't even know whether he is delivering for RUSH or EATS.

171.     Substantially all, if not all, GrubHub orders involve gratuities.  GrubHub reports its average national gratuity is 13.9 percent per order, with New York City falling below the average at 13.1 percent. This does not include cash tips. See **Exhibit F**.

### FACTS SPECIFIC TO EATS

172.     On or about March 16, 2016, UBER launched EATS in NYC which was an attempt to usurp GrubHu''s share of the market.

173.     EATS is another UBER service whereby UBER deals directly with the restaurants is signs up for service.

174.     Upon information and belief, UBER charges the restaurants as much as 30% of the restaurant's bill prior to taxes.  The team behind EATS said charging any less would be "unsustainable".

175.     A spokesperson for UBER provided the following statement to EATER.com:

> UberEats delivers delicious meals at menu price, plus a clearly marked delivery fee. In exchange we charge the restaurant a modest service that in most cases is less than the cost of operating their own delivery service. Our goal is to grow the pie for everyone, rather than servicing a narrow niche of customers willing to pay stunning high mark-ups." See http://www.eater.com/2016/2/9/10940754/ubereats-amazon-restaurant-delivery-charges.

176.     At all times relevant to this Complaint, UBER charged the Couriers 20% of their EATS compensation.

177.     EATS charged the user (customer) a $3.99 "Service Charge" purportedly in lieu of a gratuity.  The user or purchaser, however, would never know the "Service Fee" was not a gratuity.  At no place in the EATS "app" is the user put on notice that the "Service Charge" is

not a gratuity.

178.    The Service Charge shows up for the first time when the EATS patron pays.

179.    EATS does not include receipts on the bag, but it does allow the user to view its receipts on-line.  At no place on-line is the user told the "Service Charge" is not gratuity.

180.    At no place in the "app" is the user told he/she can go on-line to view the receipt.

181.    Consequently, there is zero chance the customer was put on notice the "Service Charge" was not a gratuity.

182.    In or about November 2016, UBER changed the name of the "Service Charge" to "Booking Fee", and reduced it from $3.99 to $2.99.

183.    At no place in the app is the user told the "Booking Fee" is not a gratuity.

184.    The Couriers never received either.

## SERVICE CHARGES

185.    In order for the Service Charge, or "Booking Fee" to properly be a charge and not a gratuity, UBER must provide adequate notification including a statement in the contract or agreement with the customer, and on any menu and bill listing prices, that the charge is not purported to be a gratuity.

186.    The statement must also be in ordinary language readily understood and shall appear in a font size on the receipt similar to surrounding text, but no smaller than a 12-point font.

187.    UBER provides no notification what-so-ever that the $3.99 "Service Charge" and $2.99 "Booking Fee" is not gratuity.  Further, no receipt is included with EATS deliveries.

188.    The EATS 'Service Charge", and "Booking Fee", is a gratuity, and must be

passed on to the Couriers.

## UBER ILLEGALLY RETAINED GRATUITIES

189.    Until March 16, 2016, a significant percentage of RUSH assignments entailed

gratuities via Grubhub.  After March 16, the percent of gratuities via GrubHub has slowly

decreased from approximately 70% to approximately 30%.

190.    Under Federal Department of Labor Guidelines:

> Retention of Tips: A tip is the sole property of the tipped employee
> regardless of whether the employer takes a tip credit.  The FLSA prohibits
> any arrangement between the employer and the tipped employee whereby
> any part of the tip received becomes the property of the employer. For
> example, even where a tipped employee receives at least $7.25 per hour in
> wages directly from the employer, the employee may not be required to
> turn over his or her tips to the employer. US Dept. of Labor, Fact sheet
> No. 15.

191.    Section 196-d of the New York Labor Law states

> Gratuities.  No employer or his agent or an officer or agent of any
> corporation, or any other person shall demand or accept, directly or
> indirectly, any part of the gratuities, received by an employee, or retain
> any part of a gratuity or of any charge purported to be a gratuity for an
> employee.  This provision shall not apply to the checking of hats, coats or
> other apparel.  Nothing in this subdivision shall be construed as affecting
> the allowances from the minimum wage for gratuities in the amount
> determined in accordance with the provisions of article nineteen of this
> chapter nor as affecting practices in connection with banquets and other
> special functions where a fixed percentage of the patron's bill is added for
> gratuities which are distributed to employees, nor to the sharing of tips by
> a waiter with a busboy or similar employee.

192.    When tips are given by customers via credit card, the employer must pay the

employee the amount due no later than the next regularly scheduled pay day. The employer may

subtract from the employee's tips the pro-rated share of the charge levied by the credit card

company.  An employer remitting tips to an employee must include a breakdown between the

tips and the wages on the employee's wage statement, which must meet all other requirements

for wage statements.

193.     This position reflects a change in DOL policy as set forth in DOL opinion RO-08-0032 related to this issue.

194.     UBER is the Couriers' employer, and charged with collecting the gratuities.

195.     Section 4.7 of the Agreement states: "In the event that a User pays Company a valid gratuity on your behalf, Company will transmit such gratuity to you and will not retain any portion of that gratuity."

196.     Based on past practices of failing to remit gratuities, UBER knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to the drivers.

197.     To put this in perspective, the Courier delivers a food-order, and is compensated $5.00 minus 20% which goes to UBER.  The person ordering the food left an $18.00 tip, expecting it to go to the person delivering the food.  Instead, either the restaurant or UBER retains the $18.00 gratuity.

198.     UBER obviously collected gratuities from at least three restaurants.  In March 2016, UBER contacted the active Couriers by text and informed them it would pay out all gratuities for three restaurants - Blockheads, Genuine Superette, and Big Daddy's for the period March 2015 to March 2016.

199.     Upon information and belief, UBER deliberately sent vital information pertaining to the individual couriers like plaintiffs and the putative class by ephemeral messages like text messages rather than email to cover-up what is clearly an artifice to cover-up a clear plan to deprive the Couriers of the gratuities they earned from March 2015 - March 2016.

200.     The March UBER text also asked plaintiffs BURGOS and WALKER to verify

whether the amount in the text was equal to the gratuities for Blockheads, Genuine Superette, and Big Daddy's from March 2015 to March 2016.

201.    At no time, however, did the receipts on the deliveries from Blockheads, Genuine Superette, and Big Daddy's list the amount of the gratuities, or any other number for that matter.

202.    The Couriers had no possible way to calculate the gratuities from Blockhead's, Genuine Superette, and Big Daddy's.

203.    Upon information and belief, the amount offered for the Blockhead's, Genuine Superette, and Big Daddy's was radically below the gratuities actually paid to UBER on behalf of plaintiffs BURGOS and WALKER and part of the Putative Class.

204.    Amazingly, UBER did not pay plaintiffs FOGEL and AGUILAR any gratuities from the Subject Restaurants, even though FOGEL and AGUILAR delivered many times for Blockhead's and Big Daddy's.

205.    As for the other nearly two hundred restaurants plaintiffs delivered for, either the restaurant or UBER illegally retained the tips.  Which entity, however is of no moment.  UBER had an absolute legal and contractual obligation to pass the tips from the restaurants to the Couriers.

206.    To put this in perspective, if the restaurant retains an $18.00 tip, but pays only $7.00 for the service, it makes $11.00.  The Courier risks life and limb, yet the gratuity intended for him/her is kept by the very entities that fired their delivery personnel in favor of UBER.

207.    Further, due to the over-hiring of Couriers, the competition for orders become fierce.  Plaintiffs, and other members of the Putative Class, were forced to sit at "hot spots", which are spots outside high-volume restaurants, and wait for a push notification.

208.    Once a restaurant requests a Courier, UBER sends the delivery notification to the

nearest one in the proximity.

209.   This forces the Couriers, at any given point during lunchtime and dinnertime, to wait at the various hot-spots.

210.   What the restaurants did, with UBER's help, was move their delivery workers outside and misclassify independent contractors.  The Couriers were then denied gratuities, safety gear, minimum and overtime wages, Worker's Compensation, Unemployment Insurance, etc.

211.   Further, GrubHub is responsible for making sure all tips it receives are properly distributed.

212.   On April 16, 2014 New York Attorney General Eric Schneiderman reached an agreement with GrubHub Inc.:

> Our settlement with GrubHub changes a billing formula that may have been used by restaurants to shortchange workers out of their hard-earned tips - tips that customers intended for them," Attorney General Schneiderman said. "In addition, this agreement will leave no doubt among the thousands of restaurants doing business through GrubHub about what their legal obligations are-not only with regard to tips, but also for all laws that protect the rights of workers.  Today's agreement addresses a problem that may have affected thousands of delivery workers, and the industry will be better off for it." See **Exhibit L**.

213.   The Attorney General further stated:

> Beyond changes to the fee structure, the company will send all New York restaurant partners, which number well into the thousands, a notice informing them of their labor law obligations, with particular focus on issues related to delivery workers.  The company will also include a new requirement in its standard contract that restaurants must comply with all laws applicable to delivery workers, including wage and hour laws and laws requiring timely and full distribution of tips.  Finally, GrubHub will include a new notification in the billing invoices it sends to restaurants, stating that tips are the property of the delivery workers.

214.   GrubHub, apparently, never complied with the forgoing.

215.     Three of the restaurants that were contacted by plaintiff BURGOS told him the GrubHub tips were for the restaurant.  There are also no receipts on the vast majority of the GrubHub deliveries.

216.     Defendants' unlawful conduct was intentional, willful, in bad faith, and caused significant damages to plaintiffs and other similarly situated and current and former workers.

217.     Defendants failed to inform plaintiffs and the Putative Class their tips would be credited towards the payment of the minimum wage.

218.     Plaintiffs and the Putative Class have been victims of Defendants' common policy and practices violating their rights under the FLSA and New York Labor Law by inter alia, willfully denying them their earned tips and not paying them the wages they were owed for the hours they had worked.

219.     Defendants' pay practices resulted in plaintiffs and the Putative Class not receiving payment for all their hours worked, resulting in plaintiffs' and the Putative Class' effective rate of pay falling below the required minimum wage.

220.     As part of its regular business practice, Defendants intentionally, willfully, and repeatedly harmed plaintiffs and the Putative Class by engaging in a pattern, practice, and/or policy of violating the FLSA and the NYLL.  This pattern, practice and/or policy included depriving delivery workers of a portion of the tips earned during the course of employment, illegally retaining the Service Charges, and failing to pay all hours at the prevailing minimum wage.

221.     Defendants unlawfully misappropriated charges purported to be gratuities, received by delivery workers in violation of New York Labor Law § 196-d (2007).

## UBER EVADED NYC SAFETY LAWS

222.     Between 1996 and 2005, there were 225 bicyclist deaths in New York City.  An average of 23 bicyclists died per year.  In NYC, 97% of biking fatalities were due to people who were not wearing helmets. **Exhibit G**.

223.     Per the 2014 Bureau of Labor Statistics report, the transportation industry accounts for 40 percent of all fatal occupational injuries, making it the second most dangerous occupation (construction ranks #1).  Service providers, including delivery drivers, account for most transportation deaths.

224.     A 2015 report based on traffic data from NYC's Open Data portal revealed that 77.5 percent of bicycle crashes resulted in an injury, and recent years have seen NYC cyclist deaths increase despite efforts to improve safety. See http://www.tastetalks.com/seamless-grubhub-delivery-tipping-1873154639.html.

225.     What UBER has done is shifted the decision to wear, and the burden and expense of purchasing, safety equipment onto the food delivery personal; historically one of the lowest compensated and least educated group of employees in ant industry.

226.     UBER did not even offer safety training before turning these kids out onto the street to make deliveries.

227.     New York City law regarding bicycle safety is written very generally, and includes: every person, firm, partnership, joint venture, association or corporation which engages during its business, either on behalf of itself or others, in delivering packages, parcels, papers or articles of any type by bicycle shall post one or more bicycle safety posters at each employment site.

228.     Undoubtedly UBER "engages [couriers] in the course of its business, either on

behalf of itself or others".  As such UBER was, and is, obligated to provide their bicycle Couriers with the following: (i) A bicycle helmet in good condition, which fits properly [fits the operator]; (ii) Upper body apparel with the business' name and operator's identification number; (iii) Numbered business ID card with the operator's photo, name, home address and the business' name, address and phone number; (iv) A white headlight and red taillight; (v) A bell or other audible signal (not whistle); (vi) Working brakes; and (vii) Reflective tires and/or other reflective devices on new bicycles.

229.    Businesses must also maintain a log book, which must be available for inspection during regular and usual business hours.  UBER failed to do this.

230.    UBER failed to comply with all bicycle courier laws.

## UBER IS THE COURIERS' EMPLOYER

231.    At all relevant times, Defendants were the plaintiffs and Putative Class's employers within the meaning of the FLSA and New York Labor Law.  Defendants had the power to hire and fire plaintiffs and the Putative Class, control their terms and conditions of employment, and determine the rate and method of any compensation in exchange for plaintiffs and the Putative Class's services.

232.    All decisions complained of here came directly from UBER headquarters.

233.    At all times relevant to this Second Amended Complaint, UBER falsely claimed the Couriers were Independent Contractors.

234.    By law, a person is an independent contractor only when free from control and direction in the performance of such services; that is not the case here.

235.    This right of control need not extend to every possible detail of the work.

236.    Rather, the relevant question is whether the entity retains "all necessary control"

over the worker's performance.

237.    The fact that a certain amount of freedom is allowed or is inherent in the nature of the work involved does not preclude a finding of employment status.

238.    The pertinent question is not how much control UBER exercises, but how many rights does UBER retain to exercise.

239.    UBER controls nearly every aspect of the Couriers' employment.

240.    "Within the messenger industry, it is standard practice that bike and foot messengers (messengers) are considered to be employees of the messenger company providing delivery services to its customers." See The New York State Department of Labor Guidelines for Determining Worker Status Messenger Courier Industry. See **Exhibit H.**

241.    While UBER calls itself a "technology platform" in order to avoid being deemed an employer.  It is impossible to believe a "technology platform" demands the following in its application before an individual is allowed to use it:

>    Uber (the "Company") may obtain information about you from a third party consumer reporting agency for employment purposes.  You may be the subject of a "consumer report" and/or an "investigative consumer report" which may include information about your character, general reputation, personal characteristics, and/or mode of living, and which can invoke personal interviews with sources such as your neighbors, friends, or associates.  These reports may contain information regarding your criminal history, social security verification, motor vehicle records ("driving records"), verification of your education or employment history, or other background checks.

242.    UBER also controls all fares charged, incentive pay, and bonuses.

243.    For example, in or about March 2016 UBER reduced the fees paid to the Couriers, and instituted a policy whereby UBER replaced the 85% assignment completion with "Bonus Pay".  Bonus Pay is when UBER compensates its Couriers an extra amount if they work

certain periods, or in inclement weather.

244.   At times, UBER set scheduled hours for the Couriers.

245.   UBER also utilizes "bonus pay" in the same way as it used incentive pay - to manipulate schedules.

246.   For each Courier to even hope to earn a livable rate, he or she must comply with the rules for the bonus and incentive pay rules.

247.   The incentive and bonus pay is the way UBER controls the Couriers schedule.

248.   UBER has attempted to misclassify the Couriers as "Independent Contractors". Independent Contractors are persons who are in business for themselves and hold themselves and available to the general-public to perform similar services.

249.   The New York State Commercial Goods Transportation Industry Fair Play Act ("Fair Play Act"), which went into effect as of April 10, 2014, offers guidance on the issue of whether the Couriers are employees.

250.   Because the Couriers fall under the provisions of the Fair Play Act, that Act's provisions take precedence.

251.   Under the Fair Play Act, plaintiffs or any member of the Putative Class must be a separate business entity to be classified as an independent contractor, or they must be:

     i.   free from the control and direction of the hiring company in performing the work; and,

     ii.   the service provided by the driver is different than the services provided by the company or is otherwise not part of the usual business of the company; and,

     iii.   the driver is customarily engaged in carrying out such same services as an independent established trade or profession, rather than simply working for the company.

252.   Defendants woefully failed to satisfy the above standard.

253.    First, plaintiffs and the Putative Class are not separate business entities by class definition.

254.    Second, as described below, the Couriers are not remotely free from the direction and control of UBER.

255.    Third, the service provided by UBER is the same service offered by plaintiffs and the Putative Class.

256.    Fourth, plaintiffs and the Putative Class are not customarily engaged in carrying out the same services as an independent trade.  In fact, UBER warns the Couriers at orientation that they will be terminated if they are found to be working for another courier service.

257.    All of the above conditions must be met in order for UBER to rebut the presumption of an employer-employee relationship with its driver; they cannot.

258.    In fact, a Court of competent jurisdiction has already found the livery drivers are employees. See *O'Conner v. Uber Technologies, Inc.*, 3:13-cv-03826-EMC (N.D. Cal. March 11, 2015).

259.    Similarly, the UBER livery drivers were found to be employees in the United Kingdom. See **Exhibit I**.

260.    The New York State Dept. of Labor also found two livery drivers for UBER were employees. See **Exhibit J**.

### DOL INDICATORS OF AN EMPLOYMENT RELATIONSHIP

261.    The United States Department of Labor ("US DOL") offers nine common-law indicators to determine if there is an employment relationship.  All nine indicators heavily favor a finding that the Couriers are employees of UBER.

262.    **DOL Indicator 1**: *The messenger company makes standard withholding*

*deductions from the messenger's earnings.* The agreement between Defendants and the Couriers (the "Agreement") provides: "Notwithstanding anything to the contrary in this Agreement, Company may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from your provision of Delivery Services and/or provide any of the relevant tax information you have provided pursuant to the requirement mentioned above, directly to the applicable governmental tax authorities on your behalf or otherwise." See **Exhibit K**.

263.    **DOL Indicator 2**: *The messenger company may provide fringe benefits to the messenger.* This factor weighs in favor of plaintiffs and the putative class. Couriers get bonuses and incentives, which formed, and form, as much as 70% of the Couriers salary. UBER also provides iPhones, and messenger bags marked UBER.

264.    **DOL Indicator 3**: *The messenger company sets the rate of pay, which is normally based on the higher of an hourly rate or fee basis.* This factor weighs in favor of plaintiffs and the Putative Class, UBER sets the rates of pay.

265.    **DOL Indicator 4**: *The messenger company sets the work schedule.* At times UBER set the schedules for the Couriers. UBER also controls the schedules through the incentive and bonus pay.

For example, as the below shows, UBER offers a bonus which changes, offering more money to keep the couriers on the road "all day".



The incentive and bonus pay form approximately a significant part of the Couriers' salary.  To earn a livable wage, the courier had to accept the daily bonus offers and must fulfill 85% of the orders to get the incentive pay which is equal to 1.3 times the Couriers' daily pay. This forces the Couriers to stay on-line and is tantamount to setting a work schedule.

266.    **DOL Indicator 5**: *The messenger company requires the services to be performed personally, and the messenger is not able to provide his/her own substitute.* This factor weighs in favor of plaintiffs and the putative class.  The Agreement provides at § 2.6.1: "Company Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than you.  Couriers must deliver package and may not substitute."  UBER also instituted a random verification system whereby the Courier is forced to take a picture of himself, and the UBER system then runs the picture through a facial recognition system.

267.    **DOL Indicator 6**: *The messenger company covers the messenger under the company's Workers' Compensation policy.*  This factor weighs in favor of UBER; Defendants' do not cover the Couriers under its Workers Compensation policy.  This factor also makes little sense.

268.   **DOL Indicator 7**: *The messenger company sets the order and priority of delivery.*  This factor weighs in favor of plaintiffs and the Putative Class.  Couriers get notices of the next assignment from UBER, and have no ability to choose which deliveries they want.  The Courier either takes the assignment, or it is deemed a miss-delivery.  UBER now monetarily penalizes those Couriers that pass on a delivery.

269.   **DOL Indicator 8**: *The messenger company requires the messenger to accept an assignment.*  This factor weighs in favor of plaintiffs and the putative class.  If the messenger misses more than a 15% of the pushes to your phone, for any reason, the courier losses a significant portion of the compensation for that day.

270.   **DOL Indicator 9**: *The messenger company requires the messenger to follow all company rules and regulations.*  Section 3.1 of the Agreement states: "You acknowledge and agree that Company reserves the right, at any time in Company's sole discretion, to deactivate or otherwise restrict you from accessing or using the Provider App or the Uber Services if you fail to meet the requirements set forth in this Agreement."

Further, to earn a livable wage, plaintiffs and the Putative Class must follow all rules and regulations once they enable the application (which is the equivalent of clocking into work).  The Couriers must take the assignments given, and complete them in time frames set by UBER.  Also, if the Courier receives unfavorable ratings, he/she must receive favorable ratings or they will be "deactivated".   This factor weighs in favor of a finding that the plaintiffs and the Putative Class have at all times relevant to this Complaint been employees of Defendants.

271.   UBER fails every US DOL Indicator, and is the employer of the Couriers.

## ADDITIONAL PROOF OF EMPLOYMENT

272.     While the agreements between Defendants and the Couriers specifically states the Couriers have the unfettered right to work for other delivery companies like Caviar, Postmates, AndoFood.com, Delivery.com, or Amazon Prime; that is not the reality of the relationship.

273.     At the orientation held in December 2015, UBER told the Couriers including plaintiffs BURGOS, that the Couriers would not be able to handle working for multiple services, and UBER would be able to tell if they did.  The Couriers were then informed that if any of them were found to be working at another service, that Courier would be "deactivated" from UBER.

274.     Deactivation is yet another method to control the Couriers and is the equivalent of termination. The employer's "right to discharge at will, without cause" is "strong evidence in support of an employment relationship."

275.     The Agreement provides:

> Company retains the right to deactivate or otherwise restrict you from accessing or using the Provider App or the Uber Services in the event of a violation or alleged violation of this Agreement, your disparagement of Company or any of its Affiliates, or your act or omission that causes harm to Company's or its Affiliates' brand, reputation or business as determined by Company in its sole discretion.

See **Exhibit K.**

276.     Section 3.1 of the Agreement states:

> You acknowledge and agree that you may be subject to certain background and driving record checks from time to time in order to qualify to provide, and remain eligible to provide, Delivery Services. You acknowledge and agree that Company reserves the right, at any time in Company's sole discretion, to deactivate or otherwise restrict you from accessing or using the Provider App or the Uber Services if you fail to meet the requirements set forth in this Agreement.

277.    Section 2.5.2 of the Agreement provides:

> If you do not increase your average rating above the Minimum Average Rating within the time period allowed (if any), Company reserves the right to deactivate your access to the Provider App and the Uber Services.

278.    Section 12.2 of the Agreement states:

> Company may terminate this Agreement or deactivate your Provider ID immediately, without notice, with respect to you in the event you no longer qualify, under applicable law or the standards and policies of Company and its Affiliates, to provide Delivery Services or to operate your Transportation Method, or as otherwise set forth in this Agreement.

279.    UBER has discharged members of the Putative Class at-will, and for no apparent cause.

280.    Other indicia of employment include: (i) the plaintiffs' and Putative Class' lack of investment in equipment or materials required for his task, or his employment of helpers, (2) the fact that the services rendered do not require a special skill; and (3) the services rendered by plaintiffs and the Putative Class are an integral part of the alleged employer's business.

281.    UBER also reserves the right to disclose plaintiffs' and the Putative Class' private information.  Section 4.6 of the Agreement states:

> Receipts include the breakdown of amounts charged to the User for Delivery Services and may include specific information about you, including your name, contact information and photo, as well as a map of the route you took.

282.    Based on the forgoing, the fact that plaintiffs and the putative class are properly classified as employees is irrefutable.

## DEFENDANTS' ARE A UNIFIED EMPLOYER

283.    Each of the individual Defendants form UBER, and is run pursuant to a unified plan and management.

284.    The control and direction of every aspect of Portier, Inc., from general policies to hiring and firing, wages, and policies, is centralized at the UBER headquarters.

285.    Further, each Defendant shares the same back-end bookkeeping, upper-management, human resources, accounting, payroll and banking, all of which is controlled by UBER.

## FAILURE TO PROVIDE WAGE STATEMENTS ACCESS TO WAGE POSTERS

286.    Defendants failed to provide plaintiffs and the Putative Class with wage statements at the time of payment of wages, containing: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked, as required by NYLL § 195(3).

287.    Defendants failed to provide plaintiffs and the Putative Class, at the time of hiring, a statement in English and the employees' primary language, containing: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowance, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main

office or principal place of business, and a mailing address if different; and the telephone number of the employer, as required by New York Labor Law § 195(1).

288.     Upon information and belief, until this lawsuit was filed, Defendants did not post the notices required by the FLSA and NYLL and/or did not otherwise inform plaintiffs and the Putative Class of the requirements of the tip credit.

289.     Defendants have not informed plaintiffs and the Putative Class about the tip credit, or the employment laws generally, in Spanish or other languages spoken by the employees, even though other rules and guidelines are posted in Spanish.

290.     Defendants' policy, pattern and/or practice of paying plaintiffs and the Putative Class a tipped wage despite their substantial work unrelated to a tipped occupation and failing to maintain and/or preserve accurate records of the hours plaintiffs and similarly situated employees perform tipped work and/or non-tipped wo0rk, along with the corresponding wages received, for the purposes of determining pay, is a violation of the requirements of the FLSA and the NYLL.

## ILLEGAL DEDUCTIONS – "Tools of the Trade"

291.     Defendants required plaintiffs, and the Putative Class to purchase their own tools of the trade including their own bicycles, helmets and reflectors in making deliveries for defendants.

292.     Until this lawsuit was filed, plaintiffs and the Putative Class bore all costs associated with the maintenance of the bicycles.

293.     The bicycles used by plaintiffs and the Putative Class are tools-of-the-trade that are specifically required for the performance of their duties.

294.     Plaintiffs BURGOS was forced to purchase and replace his bike, as well as pay for repairs.

295.     Plaintiff AGUILAR was forced to purchase a new bicycle after his original bicycle was stolen while making a RUSH delivery.  He also was forced to repair his bicycle after an accident, replace the brakes, and repair numerous tires.

296.     Plaintiff FOGEL was forced to pay for repairs including flat tires.

297.     WALKER paid for brakes, numerous flats, and a new bike.

298.     Defendants' policy, pattern and/or practice of requiring that plaintiffs and the Putative Class bear the cost of a bicycle, helmet and reflectors and maintenance, brings plaintiffs and the Putative Class' wages below the prevailing minimum wage rate and is a violation of the FLSA and the NYLL.

## WORKER"S COMPENSATION AND UNEMPLOYMENT

299.     Plaintiffs and the Putative Class was not eligible for worker's compensation or unemployment.

300.     Despite numerous injuries which resulted in significant periods of lost work time, plaintiffs and Putative Class were illegally deprived of worker's compensation.

301.     While the Couriers were told they were not eligible for unemployment, New York State granted two drivers unemployment benefits.

302.     All Couriers should be eligible for worker's compensation and unemployment.

## FIRST CAUSE OF ACTION
### (Fair Labor Standards Act – Failure to Pay Overtime)
### (Brought on Behalf of plaintiffs and all FLSA Class Members)

303.     Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

304.     Defendants have engaged in a widespread pattern and practice of violating FLSA, as detailed in this Complaint.

305.    Plaintiffs have consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b).

306.    At all times relevant, plaintiffs were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

307.    The overtime wage provisions set forth in §§ 201 et seq. of FLSA apply to defendants.

308.    Defendants are an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

309.    Defendants failed to pay plaintiffs overtime wages to which they were entitled under FLSA.

310.    Defendants' violations of the FLSA, as described in this Complaint, have been willful and intentional.  Defendants have not made a good faith effort to comply with FLSA with respect to its compensation of plaintiffs.

311.    Because defendants' violations of the FLSA have been willful, the three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

312.    As a result of defendants' willful violations of FLSA, plaintiffs have suffered damage by being denied overtime wages in accordance with 29 U.S.C. § 201 et seq.

313.    As a result of the unlawful acts of defendants, plaintiffs have been deprived of overtime compensation and other wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
### (New York Labor Law - Wage Theft Prevention Act)
### (Brought on Behalf of plaintiffs and all FLSA Class Members)

314.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

315.    Defendants violated NYLL § 195(1) by failing to furnish plaintiffs, at the time of hiring and on or before February 1st of each subsequent year of employment, with a notice containing the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with NYLL § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer, and anything otherwise required by law.

316.    Due to defendants' violation of NYLL § 195(1), plaintiffs and members of the FLSA Collective are entitled to recover from defendants liquidated damages of $50.00 per workweek that the violation occurred, up to a maximum of $2,500, reasonable attorneys' fees, and costs and disbursements of the action, pursuant to the NYLL §198(1-b).

317.    Defendants violated NYLL§ 195(3) by failing to furnish plaintiffs and the with each payment of wages a statement listing: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, wee salary, piece, commission, or other; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked; gross wages; deductions;

allowances, if any, claimed as part of the minimum wage; and net wages.

318.     Due to defendants' violation of NYLL § 195(3), plaintiffs are entitled to recover

from the defendants liquidated damages of $100 per workweek that the violation occurred, up to

a maximum of $2,500, reasonable attorney's fees, and costs and disbursements of the action,

pursuant to the NYLL § 198(1-d).

### THIRD CAUSE OF ACTION
**(Fair Labor Standards Act – Failure to Pay Minimum Wage)**
**(Brought on Behalf of plaintiffs and all FLSA Class Members)**

319.     Plaintiffs reallege and incorporate by reference all allegations in all preceding

paragraphs.

320.     At all times during their employment, plaintiffs and the Putative Class were

employed by defendants from November 1, 2013 through the term of the trial and were required

to be paid a minimum hourly wage for every hour worked for defendants.

321.     Since on or about April 16, 2014 through the present, defendants have violated

the provisions of the FLSA, 29 U.S.C. § 206 and §215(a)(2) by failing to pay the plaintiffs and

other similarly situated employees a minimum hourly wage.

322.     Defendants knew or showed a reckless disregard for the provisions of the FLSA

concerning the payment of minimum wages and remains owing the named plaintiffs and other

similarly situated employees a minimum wage for every hour worked during the three year

period preceding this lawsuit.

323.     Accordingly, both named and represented plaintiffs are entitled to recovery of

such amounts, liquidated damages, prejudgment interest, attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### (Violation of the NYLL § 196-d – Illegal Retention of Gratuities)
### (Brought on Behalf of plaintiffs and all Rule 23 Class Members)

324.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

325.    At all times during their employment, plaintiffs and the Putative Class were employed by defendants from November 1, 2013 through the term of the trial and were required to be paid their gratuities.

326.    Defendants violated NYLL § 196-d by retaining gratuities that rightfully belong to Plaintiffs and the Rule 23 Class.

327.    Defendants violated NYLL § 196-d by retaining gratuities mislabeled Service Charges that rightfully belong to plaintiffs and the Rule 23 Class.

328.    Defendants knew or showed a reckless disregard for the provisions of the FLSA concerning the payment of minimum wages and remains owing the named plaintiffs and other similarly situated employees a minimum wage for every hour worked during the three year period preceding this lawsuit.

329.    Accordingly, both named and represented plaintiffs are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees and costs.

330.    Accordingly, both named and represented plaintiffs are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
### (FLSA, 29 C.F.R. § 531.35 - Illegal Kick-Backs)
### (Brought on Behalf of plaintiffs and the FLSA Collective)

331.    Plaintiffs incorporate herein the allegations contained in the preceding paragraphs.

332.    At all times relevant to this Second Amended Complaint, UBER required all

Couriers to kick 20% of their compensation back to UBER.

333.    The Code of Federal Regulation § 531.35 applies to situations in which an employee is required to "kickback" a portion of the employee's wages to the employer or another party for the employer's benefit.

334.    The kickback here to UBER by the Couriers is a clear violation of 29 C.F.R. § 531.35.

335.    The Couriers also incurred expenses necessary to the performance of the Courier's duties like helmets, replacement bicycles, brake pads and tire replacement kits/tubes.

336.    UBER failed to reimburse any of these expenses, at any time.

337.    The flat amount per delivery provided to the Couriers minus expenses was often insufficient to satisfy the Couriers statutory minimum and overtime wages.

338.    This constitutes a second violation of 29 CFR  531.35.

339.    Accordingly, both named and represented plaintiffs are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### (Illegal Kick-Backs - § 193 NYLL)
### (Brought on Behalf of plaintiffs and the FLSA Collective)

340.    Plaintiffs incorporate herein the allegations contained in the preceding paragraphs.

341.    At all times relevant to this Second Amended Complaint, UBER required all Couriers to kick 20% of their compensation back to UBER.

342.    NYLL § 193 makes it illegal for an employee to be forced to kickback wages to his/her employer.

343.    The Couriers compensation is "wages" as defined by NYLL § 190(1),

344.    The Couriers payment to UBER of 20% of their wages is a clear violation of

NYLL § 193.

345.    The Couriers also incurred expenses necessary to the performance of the

Courier's duties like helmets, replacement bicycles, brake pads and tire replacement kits/tubes.

346.    UBER failed to reimburse any of these expenses, at any time.

347.    These unreimbursed expenses reduced the employee's actual compensation below

the required minimum or overtime wages.

348.    UBER's failure to reimburse its Couriers for Tools-of-the-Trade expenses is a

further violation of NYLL § 193.

349.    Accordingly, both named and represented plaintiffs are entitled to recovery of

such amounts, liquidated damages, prejudgment interest, attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**(Breach of Contract)**
**(Brought on Behalf of plaintiffs and all Rule 23 Class Members)**

350.    Plaintiffs incorporate herein the allegations contained in the preceding paragraphs.

351.    Defendants and plaintiffs and the Rule 23 Class entered into an employment

agreement.

352.    Plaintiffs and the Rule 23 Class agreements stated: "In the event that a User pays

Company a valid gratuity on your behalf, Company will transmit such gratuity to you and will

not retain any portion of that gratuity.  With regard to cash gratuities provided by a User or

Delivery Recipient directly to you, no portion of that gratuity is owed to or should be paid to

Company."

353.    Defendants retained the gratuities in direct contravention to the express wording

of the Agreement.

354.    Accordingly, both named and represented plaintiffs are entitled to recovery of

such amounts.

## EIGTH CAUSE OF ACTION
### (New York Labor Law: Unpaid Minimum Wages)
### (Brought on Behalf of plaintiffs and all Rule 23 Class Members)

355.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

356.    At all times relevant to this action, plaintiffs and the Rule 23 Class were employees of defendants who fall within the meaning of employer under the New York Labor Law.

357.    The minimum wage and over-time wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to defendants.

358.    Defendants failed to pay plaintiffs and the Rule 23 Class the minimum wages to which they were entitled under the New York Labor Law.

359.    By defendants' failure to pay plaintiffs and the Rule 23 Class Members minimum wages, defendants have willfully violated the New York Labor Law Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

360.    Due to defendants' violations of the New York Labor Law, plaintiffs and the Rule 23 Class Members are entitled to recover from defendants their unpaid minimum wages, an equal amount in liquidated damages, reasonable attorneys' fees and costs of the action, pre-judgment and post-judgment interest, and notice and an opportunity for class members, after the determination of class-wide liability and of individual back pay and interest, to intervene in this action or to file their own suits and petition individually for liquidated damages, and other relief pursuant to New York Labor Law Article 19, §§ 650 et seq.

**NINTH CAUSE OF ACTION**
**(Violation of the Notice and Recordkeeping**
**Requirements of the New York Labor Law)**
**(Brought on Behalf of plaintiffs and all Rule 23 Class Members)**

361.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

362.    Defendants failed to provide plaintiffs and the Rule 23 Class with a written notice, in English and/or Spanish, of their rate of pay, regular pay day, and such other information as required by NYLL § 195(1).

363.    Defendants are liable to the plaintiffs and the Rule 23 Class in the amount of $2,500, together with costs and attorneys' fees.

**TENTH CAUSE OF ACTION**
**(New York Labor Law: Unpaid Overtime Wages)**
**(Brought on Behalf of plaintiffs and all Rule 23 Class Members)**

364.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

365.    At all times relevant to this action, plaintiffs and the Rule 23 Class were employees of defendants who fall within the meaning of employer under the New York Labor Law.

366.    The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to defendants.

367.    Defendants failed to pay plaintiffs and the Rule 23 Class the over-time wages to which they were entitled under the New York Labor Law.

368.    By defendants' failure to pay plaintiffs and the Rule 23 Class Members minimum wages, defendants have willfully violated the New York Labor Law Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations, including but not limited

to the regulations in 12 N.Y.C.R.R. Part 142.

369.    Due to defendants' violations of the New York Labor Law, plaintiffs and the Rule 23 Class Members are entitled to recover from defendants their unpaid over-time wages, reasonable attorneys' fees and costs of the action, pre-judgment and post-judgment interest, and notice and an opportunity for class members, after the determination of class-wide liability and of individual back pay and interest, to intervene in this action or to file their own suits and petition individually for liquidated damages, and other relief pursuant to New York Labor Law Article 19, §§ 650 et seq.

## ELEVENTH CAUSE OF ACTION
### (Violation of the NYLL Spread-of-Hours Provision)
### (Brought on Behalf of plaintiffs and all Rule 23 Class Members)

370.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

371.     At all times relevant to this action, plaintiffs and the Rule 23 Class were employees of defendants.

372.    Defendants are an employers within the meaning of the New York Labor Law.

373.    The spread-of-hours pay provisions of 12 N.Y.C.R.R. § 142-2.4 applies to defendants.

374.    Defendants has failed to pay plaintiffs one hour of pay those days the Couriers worked in excess of 11 hours per day under the New York Labor Law ("Spread-of-Hours" pay).

375.    By Defendants' failure to pay spread-of-hours defendants willfully violated the New York Labor Law Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

376.    Due to defendants' violations of the New York Labor Law, plaintiffs and the

Putative Class are entitled to recover from defendants unpaid spread-of- hours pay, reasonable

attorneys' fees and costs of the action, pre-judgment and post-judgment interest, liquidated

damages, and other relief pursuant to New York Labor Law Article 19, §§ 650 et seq.

## TWELVTH CAUSE OF ACTION
### (Violation of the Wage Statement Provisions of the New York Labor Law)
### (Brought on Behalf of plaintiffs and all Rule 23 Class Members)

377.    Plaintiffs reallege and incorporate by reference all allegations in all preceding

paragraphs.

378.    Defendants did not provide plaintiffs and the Rule 23 Class with wage statements

upon each payment of wages, as required by NYLL § 195(3).

379.    Defendants are liable to the plaintiffs and the Rule 23 Class in the amount of

$2,500, together with costs and attorney's fees.

## THIRTEENTH CAUSE OF ACTION
### (Violation of NYLL – Failure to Provide Notice and Information about Employment Laws)
### (Brought on Behalf of plaintiffs and all Rule 23 Class Members)

380.    Plaintiffs reallege and incorporate by reference all allegations in all preceding

paragraphs.

381.    The NYLL requires employers to maintain adequate and accurate written records

of the actual hours worked and the true wages earned by employees. NYLL § 195(4); 12

N.Y.C.R.R. §§ 142-2.6, 146-2.1.

382.    Defendants failed to maintain adequate and accurate written records of the actual

hours worked and true wages earned by plaintiffs and the Rule 23 Class.

383.    Defendants' failure to maintain adequate and accurate written records of the

actual hours worked and true wages earned by plaintiffs and the Rule 23 Class was not in good

faith.

## FOURTEENTH CAUSE OF ACTION
### (Retaliation in Violation of the FLSA – 29 U.S.C. § 215(a)(3))
### (Brought on Behalf of WALKER Only)

384.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

385.    The Fair Labor Standards Act prohibits the "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the Act], or has testified or is about to testify in such proceeding, or has served or is about to serve on an industry committee." §215(a)(3).

386.    WALKER went to the UBER office and complained that his pay not only dropped below the minimum wage, but to less than zero.

387.    UBER deactivated WALKER immediately after he complained.

388.    The oral complaint satisfies the "complaint or instituted a proceeding" against defendants within the meaning and scope of Section 215(a)(3) of the FLSA.

389.    Defendants behavior towards WALKER in response to the filing of the initial Complaint was summary termination in violation of Section 215(a)(3) of the FLSA. 29 U.S.C. § 215(a)(3).

390.    Due to Defendants' illegal retaliation, plaintiff WALKER is entitled to legal and equitable relief including, but not limited to, reinstatement, enjoining Defendants from further retaliation, payment of lost and withheld compensation, back-pay, emotional distress damages, and additional amounts such as liquidated damages, interest, and reasonable attorneys' fees. 29 U.S.C. § 216(b).

## FIFTEENTH CAUSE OF ACTION
### (Retaliation in Violation of NYLL § 215)
### (Brought on Behalf of WALKER Only)

391.    Plaintiffs allege and re-allege the paragraphs above.

392.    Plaintiff WALKER complained about his wages not only falling below minimum

wage; but falling to zero.

393.    WALKER instituted a proceeding against Defendants within the meaning and

scope of Section 215 of the NYLL by formally complaining on or about December 12, 2017.

394.    Defendants behavior towards WALKER was summary termination, in clear

violation of Section 216 of the NYLL.

395.    Whether in cash or in facilities, "wages" cannot be considered to have been paid

by the employer and received by the employee unless they are paid finally and unconditionally

or "free and clear." The wage requirements of the Act will not be met where the employee

"kicks-back" directly or indirectly to the employer or to another person for the employer's benefit

the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is

made in cash or in other than cash. For example, if it is a requirement of the employer that the

employee must provide tools of the trade which will be used in or are specifically required for

the performance of the employer's particular work, there would be a violation of the Act in any

workweek when the cost of such tools purchased by the employee cuts into the minimum or

overtime wages required to be paid him under the Act. See also in this connection, §531.32(c).

396.    WALKER is entitled to a work-place Free from retaliation for complaining about

possible violations of the Labor Law.

397.    Due to Defendants' illegal discrimination and retaliation, Plaintiffs are entitled to

all appropriate relief, including, but not limited to, reinstatement, enjoining Defendants from

further retaliation, payment of lost and withheld compensation, back-pay, emotional distress

damages, additional amounts such as liquidated damages, interest, and reasonable attorneys'

fees. N.Y. Lab. Law § 215.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demands a

trial by jury on all questions of fact raised by the Amended Complaint.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, individually and on behalf of all other similarly situated past

and present employees, prays for the following relief:

A.    That, at the earliest possible time, plaintiffs be allowed to give notice, or that the Court issue such notice to all persons who are presently, or have at any time during the three years immediately preceding the filing of this suit, been employed by defendants as bicycle or foot messengers in New York City.  Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages.

B.    Unpaid minimum and overtime wages and an additional and equal amount as liquidated damages pursuant to 29 U.S.C. §§ 201 et seq. and the supporting United States Department of Labor regulations;

C.    Unpaid spread-of-hours pay;

D.    Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

E.    All gratuities illegally retained by defendants, plus an equal amount in liquidated damages;

F.    All NYLL § 193 damages;

G.    All 29 C.F.R. § 531 damages;

H.    All Service Charges and/or Booking Fees illegally retained by defendants plus an equal amount in liquidated damages;

I.    Designation of named plaintiffs as representative of the Rule 23 Class, and counsel of record as Class Counsel;

J.      Issuance of a declaratory judgment that the practices complained of in this
        Complaint are unlawful under New York Labor Law, Article 19, § 650 et seq.,
        and the supporting New York State Department of Labor regulations;

K.      Unpaid minimum and overtime wages pursuant to N.Y. Lab. Law Article 19, §
        650 et seq., and the supporting New York State Department of Labor regulations;

L.      All costs related to of tools-of-the-trade expenses;

M.      New York Labor Law Section 195 and 196 damages;

N.      All damages from defendants breach of contract;

O.      Pre-judgment interest;

P.      After the determination of class-wide liability, of individual damages, and of
        defendants' liability for back pay, notice to class members of the opportunity to
        intervene in this action or to file separate actions to recover liquidated damages
        under Article 19, § 68 1(1) of the New York Labor Law;

Q.      Attorneys' fees and costs of the action;

R.      Payment to plaintiff WALKER of all retaliation compensation including, but not
        limited to, reinstatement, enjoining defendants from further retaliation, payment
        of lost and withheld compensation, back-pay, emotional distress damages,
        additional amounts such as liquidated damages, interest, and reasonable attorneys'
        fee and costs; and,

S.      Such other relief as this Court shall deem just and proper.

Dated: December 17, 2016
       New York, New York

                                **GARBARINI FITZGERALD P.C.**

                        By:     _____
                                Richard M. Garbarini (RG 5496)
                                250 Park Avenue, 7th Floor
                                New York, New York 10177
                                Telephone: 212.300.5358
                                Facsimile: 888.265.7054
                                garbarini@garbarinilaw.com